**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**UNITED STATES OF AMERICA**

    **v.**                                                          **Criminal No. 3:21cr29**

**JERMAINE DARNELL JOHNSON**

    **and**

**RUDOLPH MIFFIN, JR.,**

      **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on four motions:

(1) Defendant Rudolph Miffin, Jr.'s Motion to Suppress Evidence Found in
Violation of the Fourth Amendment ("Miffin's Motion to Suppress I"),
(ECF No. 17);

(2) Miffin's Motion to Suppress Custodial Statements ("Miffin's Motion to
Suppress II"), (ECF No. 18);

(3) Defendant Jermaine Darnell Johnson's Motion to Suppress Evidence and
Statements ("Johnson's Motion to Suppress"), (ECF No. 31); and,

(4) Miffin's Motion to Adopt Defendant Johnson's Motion to Suppress Evidence
("Miffin's Motion to Adopt"), (ECF No. 32).

The United States responded, (ECF No. 34), and Defendants replied, (ECF Nos. 36, 37). The

Court held two evidentiary hearings and ordered supplemental briefing on two occasions. (ECF

No. 45, at 1.) The parties submitted their supplemental briefs. (ECF Nos. 48-1, 49, 50, 51-1.)

The Court held a hearing to discuss relevant matters. Based on issues raised during that hearing,

the Court ordered additional briefing for a second time. Each Defendant submitted a second

supplemental brief, (ECF Nos. 54, 55), but the United States did not, and the time to do so has

expired.  Thus, this matter is ripe for disposition.  For the reasons articulated below, the Court

will grant the Motion to Adopt, deny Miffin's Motion to Suppress II as moot, and grant in part

and deny in part Miffiin's Motion to Suppress I and Johnson's Motion to Suppress.

## I.  Procedural History and Findings of Fact

### A.      Procedural History

A grand jury indicted Johnson and Miffin, charging:  Johnson with Possession of a

Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1) ("Count One"); Miffin with

the same offense ("Count Two"); and both Johnson and Miffin with Possession with Intent to

Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1) ("Count Three").  (ECF

No. 4, at 1–3.)  Defendants appeared before this Court for Johnson's arraignment and a status

conference.  (ECF Nos. 26, 27.)  During the status conference, the Court issued a scheduling

order for motions and a date for a hearing.

Miffin timely filed his Motions to Suppress.  (ECF Nos. 17 and 18.)  Johnson also filed

his Motion to Suppress. (ECF No. 31.)  Miffin then filed his Motion to Adopt.  (ECF No. 32.)

The United States responded, (ECF No. 34), and Defendants replied, (ECF Nos. 36, 37).  All

papers were timely filed.

The Court held an evidentiary hearing.  (*See generally* ECF No. 47.)  At the hearing, the

Court heard testimony from two of the police officers who conducted the traffic stop giving rise

to the present Motions to Suppress, as well as a witness for Defendants.  The Court also admitted

into evidence twenty-one exhibits, including footage from the officers' body-worn cameras

("BWC").[1]

---

[1] The twenty-one exhibits entered into evidence do not appear on the Court's CM/ECF
docket for this case.  The Court has the paper exhibits on file.  (*See* ECF No. 46.)  The guns and
duplicates of the video exhibits were returned to the parties.  (*See id.*)

The next day, the Court ordered supplemental briefing. (ECF No. 45, at 1.) Pursuant to this Order, the United States filed its supplemental brief in response to the pending Motions to Suppress, (ECF No. 48-1), and Defendants filed their supplemental briefs in support, (ECF Nos. 49, 50). The United States replied. (ECF No. 51-1.)

The Court heard oral argument on the suppression motions a second time. The Court questioned the parties on several cases pertinent to the instant motions. The Court allowed the parties to file additional supplemental briefing to address the cases discussed during the hearing. Each Defendant filed a second supplemental brief. (ECF Nos. 54, 55.) The United States did not, however, and the time to file a second a supplemental brief has expired.

## B. **Findings of Fact**

### 1. **September 1, 2020 Traffic Stop Involving Johnson and Miffin**

Early in the morning of September 1, 2020, around 1:00 a.m., Henrico Police Officer Orride Thomas Broaddus, Jr. was on patrol in the "65 service area" of Henrico County, which encompasses three apartment buildings: Fox Rest Apartments, Place One Apartments, and Abbington West Apartments. (*See* ECF No. 47, at 8:17–22, 51:2.) At that time, Officer Broaddus was a nine-year veteran of the police force, starting with the Virginia Commonwealth University Police Department in 2012. (ECF No. 47, at 7:20–25.) He had served in the Henrico County Police Department since 2017. (ECF No. 47, at 7:20–25.) As of September 2020, Officer Broaddus had patrolled the 65 service area for at least a year and a half. (ECF No. 47, at 9:6–8.) On the morning in question, Officer Broaddus focused his patrol on vandalization and burglaries in response to "reports of juveniles in that area, specifically from Place One Apartment and Abbington West Apartments, that were frequenting that area, going to clubhouses, going to vehicles, larcenies from autos, [etc.], [and] potential burglaries and

3

activities associated with vandalism." (ECF No. 47, at 9:21–10:2; *see also* Gov't Ex. 2 "September 1, 2020 E-Brief" 1.)

### a.    Officer Broaddus Encounters Defendants During His Patrol

During his patrol early that morning, Officer Broaddus "came across a vehicle that was parked [in a dark area] in the Place One Apartment community that had [its] lights on." (ECF No. 47, at 13:19–21, 16:19–20.) Because the car having its lights on in a dark area "stuck out to" him, Officer Broaddus stopped and conducted a records check of the vehicle's license plate. (ECF No. 47, at 16:21–17:1.) Although the records check produced information associating the license plates with a different color car, no warrants were on file, and Officer Broaddus did not receive "any[ information] of concern" about the vehicle. (ECF No. 47, at 17:25–18:2.) Nonetheless, Officer Broaddus left his police cruiser and approached the parked car on foot. (ECF No. 47, at 18:11–14.)

Arriving at the car, Officer Broadus encountered a person later identified as Miffin sitting alone in the passenger seat with the door open. (ECF No. 47, at 19:4–9.) The two men spoke briefly about criminal activity in area. (ECF No. 47, at 19:12–20.) During their conversation, Defendant Johnson walked up to the car and asked "about what was going on." (ECF No. 47, at 19:25–20:5.) As he did with Miffin, Officer Broaddus engaged Johnson in a conversation about criminal activity in the area. (ECF No. 47, at 20:10–11.) Both men struck Officer Broaddus as "cooperative and cordial" during this initial encounter. (ECF No. 47, at 19:21–23, 20:14–16.) After the conversation ended, Officer Broaddus left, drove out of the Place One Apartment community, and traveled to the Fox Rest Apartment complex to continue his patrol. (ECF No. 47, at 21:17–20.)

**b.**     <u>**Officer Broaddus Stops Defendants for a Defective Light**</u>

Later that morning, around 1:25 a.m., still during his patrol, Officer Broaddus saw a car

pass him with an unlit light above its rear license plate. (ECF No. 47, at 29:1–3, 14–21, 38:3–4;

*see also* Gov't Ex. 5 "Image of Defective License Plate Light" 1.)  Because the unlit light

constituted an equipment violation, Officer Broaddus decided it was a better use of police

resources to follow that car than to continue his patrol of the 65 service area.  (ECF No. 47, at

29:14, 25–30:2.)  Officer Broaddus followed the car out of his service area onto Staples Mill

Road.  (ECF No. 47, at 29:22–34:10; *see also* Gov't Ex. 3 "Overhead Map of Place One

Apartments to Staples Mill Road" 1.)

Once on Staples Mill Road in Henrico County, Officer Broaddus caught up to the vehicle

and turned on his emergency blue lights near the intersection with Janway Road.  (ECF No. 47,

at 34:13–18, 36:8–12; Gov't Ex. 4 "Overhead Map of Traffic Stop Location" 1.)  The car

travelled about one block, stopping near an access road adjacent to the major intersection

between Staples Mill Road and Parham Road.  (ECF No. 47, at 36:25–37:9; Overhead Map of

Traffic Stop Location 1.)  This section of Staples Mill Road is a business area, located about a

mile and a half from the Henrico Police Department and Henrico Courthouse.  (ECF No. 47, at

37:16–17, 121:2–14.)  It had just rained, so the road was wet.  (ECF No. 47, at 37:13–14.)  In

addition, given the time of day, cars passed only intermittently, and the area was dark.  (ECF

No. 47, at 37:18–38:2.)

Proceeding alone, Officer Broaddus approached the driver's side window of the stopped

car, which had two occupants.  (ECF No. 47, at 41:14–21.)  Once he had walked up to the

driver's side window, Officer Broaddus realized that this was the same car he had approached

during his patrol of the Place One Apartment complex.  (ECF No. 47, at 41:17–42:3.)  After

acknowledging the initial encounter, Officer Broaddus informed Johnson, the driver, that his car had an unlit tag light.  (ECF No. 47, at 42:2–10; Gov't Ex. 16 "Broaddus BWC" 0:25–0:50.) Johnson noted his awareness of the defective light and then expressed concern to Officer Broaddus about the stop, informing Officer Broaddus that he (Johnson) was "on federal papers," a euphemism for federal supervision.  (ECF No. 47, at 42:11–17; Broaddus BWC 0:45–1:15.) Officer Broaddus explained to Johnson that a defective tag light was beyond anyone's control, and that "he should[ not] have much to be concerned about."  (ECF No. 47, at 42:23–43:17; *accord* Broaddus BWC at 1:10–1:20.)

Officer Broaddus then asked Johnson and Miffin, who occupied the front passenger seat, for their identification, advising, "When I stop a car, I need to identify both occupants."  (ECF No. 47, at 43:3–6, 18–24; Broaddus BWC 1:20–1:25.)  Johnson and Miffin then handed over their papers.  (Broaddus BWC 1:45–1:50.)  When Officer Broaddus asked for the vehicle's registration, Johnson informed Officer Broaddus that he could not find the registration because the car belonged to someone else.  (ECF No. 47, at 43:8–13; Broaddus BWC 2:10–2:20.) Johnson, however, did find a vehicle inspection report for the car, which Officer Broaddus accepted in lieu of the registration because the inspection report reprinted the car's vehicle identification number.  (ECF No. 47, at 43:14–17; Broaddus BWC 2:30–2:55.)

After receiving Defendants' paperwork, Officer Broaddus returned to his police cruiser to check their records.  (ECF No. 47, at 44:4–9; Broaddus BWC 2:50–3:00.)  The records check confirmed that Johnson was on federal supervision, although it did not specify the nature of the underlying offense or provide any detail about Johnson's criminal history.  (ECF No. 47, at 51:24–52:2, 112:10–23.)  Officer Broaddus also received a "clear" message from person checks

on Johnson, as well as an automated instruction "not [to] arrest unless a crime has occurred."

(Broaddus BWC 3:35–3:45.)

As to Miffin's records check, Officer Broaddus received an alert classifying Miffin as a

known member of the Crips Southwest Virginia gang (the "Crips"), (ECF No. 47, at 55:17–23;

Gov't Ex. 8 "Miffin NCIC Alert" 1), and based on his training and experience, Officer Broaddus

knew that the Crips had a reputation for violence, (ECF No. 47, at 58:19–59:4).  Nevertheless,

the alert about Miffin's gang membership stated, "Warning—Standing alone, NCIC gang group

and member file information does not furnish grounds for the search or seizure of any individual,

vehicle, or dwelling."  (Miffin NCIC Alert 1.)

### c.     Sergeant English Arrives on Scene and Sees Movement Inside the Car

While Officer Broadus conducted the records check, at 1:30 a.m., Henrico Police Officer

Patrick English[2] arrived on the scene.  (ECF No. 47, at 50:16–19.)  Sergeant English was not

called to the scene, but stopped to "check on" Officer Broaddus, which was normal procedure for

officers "when [they saw] another officer on a traffic stop."[3]  (ECF No. 47, at 183:11–13; see

ECF No. 47, at 50:16–51:10.)  He then asked Officer Broaddus about the stop.  (ECF No. 47, at

50:16–21; Gov't Ex. 6 "English BWC" 0:00.)  As Officer Broaddus responded, Sergeant English

interrupted and stated, "There's a lot of movement going around."  (Broaddus BWC 4:20–5:40.)

Although Sergeant English did not describe what he saw, Officer Broaddus interpreted Sergeant

English's reaction as "unusual and suspicious . . . [b]ecause when [Sergeant English] said there[

---

[2] Officer English has since been promoted to Sergeant.  The Court will therefore refer to him as "Sergeant English."

[3] Sergeant English testified that this is "particularly normal to do when it's late at night and dark" because of the "the increased danger of traffic stops at night" and "decreased resources across the county," and because [there are] a lot of elements of the division that [are not] working at night."  (ECF No. 47, at 183:14–21.)

7

was] a lot of movement in that vehicle, and walked off, that mean[t] . . . that he[] observ[ed] something that may [have] be[en] an officer safety issue." (ECF No. 47, at 60:25–61:12.)

To monitor the movement, Sergeant English approached the passenger's window of the car. (ECF No. 47, at 187:8–188:1.) Once Sergeant English arrived at the window, Johnson leaned across Miffin and volunteered that he was putting on his "slides," or slip-on sandals. (ECF No. 47, at 187:8–15; English BWC 0:45–0:55.) Sergeant English confirmed "what [he] had seen back at the vehicle, that there was reaching going on outside [his] view." (ECF No. 47, at 187:15–17.)

Meanwhile, Officer Broaddus continued to conduct the records check. (ECF No. 47, at 61:16–17.) During this time, Officer Broaddus received information associating the license plate on Defendants' car with a different vehicle. (ECF No. 47, at 62:5–8; Broaddus BWC 7:50–7:55.) This discovery gave Officer Broaddus "some concerns that [Defendants'] vehicle may have been stolen, but at the same time" Officer Broaddus recognized that the issue with the license plates may have been "due to DMV issues[ or] administrative issues" related to the COVID-19 pandemic. (ECF No. 47, at 62:12–62:18.)

d.    **Officer Broaddus Directs Johnson to Exit the Vehicle and Pats Him Down**

After concluding the records check, Officer Broaddus reapproached the stopped car and advised Johnson of the issue with the vehicle's license plates. (ECF No. 47, at 62:19–63:1; Broaddus BWC 8:25–8:40.) Officer Broaddus asked Johnson to exit the car so that they could speak privately about the issue with the license plates. (ECF No. 47, at 63:8–63:22; Broaddus BWC 8:35–8:45.) Johnson hesitated, (Broaddus BWC 9:00–9:05), and he voiced his desire to wait inside the car until his wife arrived on scene, (Broaddus BWC 9:20–30; *accord* ECF No. 47, at 63:22–23, 65:1–4). Officer Broaddus replied that he could order the car towed if Johnson

8

refused to exit the vehicle to discuss the license plate issue. (Broaddus BWC 9:35–9:40; *see also* ECF No. 47, at 67:12–20.) At that point, Johnson complied and began exiting the car. (ECF No. 47, at 67:12–21.)

As Johnson was stepping out of the car, Officer Broaddus asked, "Do you have any weapons on you?" (Broaddus BWC 9:55–10:01.) "This is a traffic stop," Johnson responded, "Why are you asking about weapons?" (Broaddus BWC 10:10–10:13.) Nevertheless, Johnson indicated that he did not possess any weapons. (Broaddus BWC 10:14–10:16.) Officer Broaddus sought confirmation and asked, "Can I pat you down to make sure you don't have any weapons?" (Broaddus BWC 10:17–10:19.) As Officer Broaddus delivered this question, Johnson slightly raised his arms, turning his back to Officer Broaddus. (Broaddus BWC 10:17–10:19; ECF No. 47, at 69:1–6.)

As Officer Broaddus started patting down his person, Johnson lowered his arms and stated, "C'mon, bro, don't do me like that, bro." (Broaddus BWC 10:20.) Officer Broaddus continued to pat Johnson's waist, prompting Johnson to turn and face Officer Broaddus. (Broaddus BWC 10:20–10:24.) As he "squared up" (as described by Officer Broaddus), Johnson voiced his non-consent more clearly: "No, I don't want you to search me." (Broaddus BWC 10:20–10:29; *see* ECF No. 47, at 74:15–75:15 (describing the meaning of "squared up"); *accord* ECF No. 47, at 69:12–22.)

      **e.**    **Officer Broaddus Sees Marijuana on Johnson's Shirt, Places**
                 **Him in Handcuffs, and Questions Him**

Officer Broaddus removed his hands from Johnson's person and directed Johnson's attention to what Officer Broaddus suspected was marijuana. (Broaddus BWC 10:30–10:35; ECF No. 47, at 69:15–16, 70:1–2; Gov't Ex. 9 "Photo of Marijuana Flake from Johnson's Shirt" 1.) After Johnson looked down, Officer Broaddus asked, "What is that?" (Broaddus

9

BWC 10:30–10:33.) "That's a problem," Johnson answered. (Broaddus BWC 10:34.) Officer

Broaddus ordered Johnson to "turn around" and put his hands behind back, but Johnson did not

comply. (Broaddus BWC 10:35–11:00.) Then, Officer Broaddus ordered Johnson "to put [his

wallet] on top of the car," which Johnson did. (Broaddus BWC 10:45–11:05.) Officer Broaddus

said, "You're not under arrest. I'm detaining you because you got marijuana on you, man. It's

illegal, okay?" (Broaddus BWC 11:05–11:08.) Moments later, Sergeant English handcuffed

Johnson's hands behind his back. (Broaddus BWC 11:23–11:25.)

After escorting Johnson away from the car, Officer Broaddus started asking him

questions. (Broaddus BWC 11:43–12:23; ECF No. 47, at 73:5–21.) Officer Broaddus

specifically asked whether there was "any more weed in th[e] car or on [Johnson's person]."

(Broaddus BWC 12:10–12:16; *accord* ECF No. 47, at 73:11–13.) Johnson initially shook his

head no, (Broaddus BWC 12:16), but after Officer Broaddus indicated that he would search the

car "to make sure there is no additional marijuana," Johnson informed Officer Broaddus that the

car's center console contained a "blunt," or a marijuana cigar, (Broaddus BWC 12:16–12:35;

ECF No. 47, at 73:14–21).

### f.    Officer Broaddus Searches a Bag on Johnson's Person

After hearing that the car contained a blunt, Officer Broaddus asked Johnson for a second

time whether Johnson possessed any weapons because he was concerned that Johnson was

armed and dangerous and that he might have additional marijuana on his person. (Broaddus

BWC 12:35–12:40; *see* ECF No. 47, at 75:16–76:5.) Approximately thirteen minutes into the

stop, without waiting for a response, and because of those concerns, Officer Broaddus opened a

zipped cross-body bag draped across one of Johnson's shoulders, resting flush against Johnson's

stomach. (Broaddus BWC 13:40–13:47; *see* ECF No. 47, at 76:6–20.) After unzipping the bag,

10

Officer Broaddus shined a flashlight inside and discovered a Glock 19, 9mm pistol and individually packaged narcotics. (Broaddus BWC 13:40–13:50; English BWC 8:29–8:51; ECF No. 47, at 76:17–25, 78:21–79:2; Gov't Ex. 10 "Glock 19 Pistol.")

Johnson immediately began yelling to get the attention of Miffin, who was still seated in the stopped car. (Broaddus BWC 14:29–32; ECF No. 47, at 79:21–25.) Eventually, Johnson shouted, "They Goddamn got the Glick[4] out the bag, bro." (Broaddus BWC 14:44–14:49; ECF No. 47, at 80:14–25.)

Johnson's statement about the gun prompted Officer English to instruct Henrico Police Officer Trevor Holmes, who had arrived on the scene at 1:36 a.m. and had been talking with Miffin, to "detain" Miffin. (English BWC 9:40; ECF No. 47, at 81:7–10; Gov't Ex. 17 "Holmes BWC" 0:00–4:13.) Once Miffin exited the car, Officer Holmes instructed Miffin that he was "not under arrest," but that he was simply "being detained right now." (Holmes BWC 4:25–30.) Officer Holmes handcuffed Miffin, patted him down, and, at 1:41 a.m., read him his *Miranda* rights. (Holmes BWC 4:13–6:03.)

At approximately the same time, 1:41 a.m., Officer Broaddus gave Johnson his *Miranda* warning. (Broaddus BWC 15:50–16:15; English BWC 10:40–11:09.) After searching Johnson's person (including his pockets) with Office Broaddus, Sergeant English secured Johnson in the front seat of Officer Broaddus's police cruiser, parked at least two car lengths behind the stopped car. (Broaddus BWC 16:37–22:20; 11:40–17:18; ECF No. 47, at 126:14–17.) Sergeant English then instructed another police officer to guard Johnson. (English BWC 17:18.)

---

[4] "Glick" refers to a Glock loaded with an extended magazine. (ECF No. 47, at 80:18–81:1.)

### g.     Officer Broaddus and Sergeant English Search Defendants' Car and Then Miffin

After securing Johnson, Officer Broaddus approached Miffin, who was still standing next to Officer Holmes several yards from the car. (Broaddus BWC 22:25–22:30.) Officer Broaddus informed Miffin that they "f[ound] some stuff in the car ." (Broaddus BWC 22:25–30.) Miffin responded that he did not have anything on his person, that he did not want to be searched, and that there was no reason to search him. (Broaddus BWC 22:35–23:10; Holmes BWC 12:25–12:35.)

Without searching Miffin, Officer Broaddus left him with Officer Holmes. (Broaddus BWC 23:20; English BWC 12:30.) While Miffin stood handcuffed on the side of the road and Johnson sat handcuffed inside a police cruiser—both with police officers standing guard over them—and pursuant to Henrico County Police policy,[5] Officer Broaddus and Sergeant English searched Defendants' car. (Broaddus BWC 23:21–44:00; English BWC 18:38–48:00; ECF No. 47, at 83:20–84:1; *see* ECF No. 47, at 81:7–89:17.) Underneath Miffin's seat, Officer Broaddus found a Taurus 9mm pistol. (Broaddus BWC 27:15–27:25; ECF No. 47, at 84:9–14; Gov't Ex. 15 "Taurus Pistol.") Officer English recovered the blunt from the car's center console,

---

[5] Officer Broaddus credibly testified that he would have been required to tow the car. (*See* ECF No. 47, at 70:19–71:23.) He explained that he could not have allowed Johnson "to drive a vehicle unlicensed to operate on a highway" and that Johnson was "required by [Virginia] law to have two operating license plates . . . to operate [the] vehicle on the roadway." (ECF No. 47, at 71:12–16.) He further indicated that he would have been required to "take the plates off the vehicle because they [did not] match that vehicle" and then tow it. (ECF No 47, at 71:18–23.) Finally, Officer Broaddus testified that pursuant to Henrico County Police policy, he would have conducted an inventory search of the vehicle as part of the towing process. (*See* ECF No. 47, at 70:25–71:23.)

Officer Broaddus also testified about what an inventory search entails. For instance, he acknowledged that the search would involve "go[ing] through the vehicle to see [what is] in it," including searching under the seats, in compartments of the vehicle, and in containers or bags inside of the vehicle. (ECF No. 47, at 72:12–73:2.) Basically, during an inventory search of a vehicle, officers "look through the vehicle for anything of value or anything that [they] could be held liable for as an agency." (ECF No. 47, at 72:25–73:1.)

which also contained a digital scale and empty extended magazines for a handgun. (ECF No. 47, at 85:10–22; Gov't Ex. 13 "Photos of Items Found in Car and from Miffin" 1.) In the front seat area, the officers discovered a large quantity of baking soda, a common cutting agent for narcotics, and several bags in the backseat that appeared to contain narcotics. (ECF No. 47, at 85:23–25, 90:10–95:6; Gov't Ex. 14 "Photos of Items Found in Car" 1–13.)

After searching the car, Officer Broaddus conducted a search of Miffin and a cross-body bag strapped to his person similar to the one strapped to Johnson's. (ECF No. 47, at 95:10–23; Broaddus BWC 44:47–44:54.) This search yielded additional individually packaged bags containing suspected narcotics. (ECF No. 47, at 97:7–16; Photos of Items Found in Car and from Miffin 3–4.)

### 2. April 8, 2021 Trip with Federal Law Enforcement

After the traffic stop, Miffin was detained at the Henrico County East Jail Facility in New Kent, Virginia (the "County Jail"). (ECF No. 9, at 1.) Several months afterward, two special agents transported Miffin to the federally used Pamunkey Regional Jail, making two stops along the way. (ECF No. 18, at 1.) During that transport, Miffin made certain incriminating statements as part of a conversation with the federal agents.[6]

### C. Summaries of the Present Suppression Motions

Three suppression motions pend before the Court, two brought by Miffin and one by Johnson. In his Motion to Suppress I, Miffin contends that Officer Broaddus unreasonably

---

[6] The United States does not contest the factual narrative Miffin presents about his April 8, 2021 car ride with federal agents from county jail to federal jail. The United States has informed the Court, through briefing, that it "does not intend to offer any of the statements Defendant made following his federal arrest in evidence." (ECF No. 34, at 19.) Accordingly, the Court will not consider those statements here, and the Court will deny as moot this aspect of Miffin's Motion to Suppress II.

prolonged the September 1, 2020 traffic stop to conduct an unlawful frisk of Johnson, and by unreasonably prolonging the traffic stop, Officer Broaddus violated Miffin's Fourth Amendment right against unreasonable seizures. (ECF No. 17 at 5–7.) This unreasonable seizure, Miffin argues, continued through the search of the car, his person, and his cross-body bag. (*Id.* 7; ECF No. 36, at 1.) To remedy these violations of his Fourth Amendment rights, Miffin seeks to exclude all evidence obtained during the unreasonable seizure, as well as any evidence derived therefrom. (ECF No. 17, at 1.)

In his Motion to Suppress II, Miffin challenges incriminating statements he made during the April 8, 2021 trip from the County Jail to the ATF Richmond III Field Office. (ECF No. 18, at 1.) Miffin maintains that he made the specific statement—"They found drugs on me, and I don't mind admitting to that, you feel me?"—during a custodial interrogation. (ECF No. 18, at 2.) Because this statement preceded a *Miranda* warning, Miffin submits that Special Agents Sessoms and Shauer violated his Fifth Amendment right against self-incrimination. (ECF No. 18, at 2.) Accordingly, Miffin moves to suppress. (ECF No. 18, at 3–4.)

In his Motion to Suppress, Johnson argues that Officer Broaddus unreasonably searched his person and cross-body bag during the September 1, 2020 traffic stop without reasonable suspicion that he was armed and dangerous, in violation of his Fourth Amendment right against unreasonable searches. (ECF No. 31, at 8–9.) Johnson seeks to suppress any evidence or statements deriving from the unlawful search of his person. (ECF No. 31, at 1.)

## II. Analysis

The Court will grant Miffin's Motion to Adopt. (ECF No. 32.) However, the Court will deny Miffin's Motion to Suppress I, except as to some statements made, and deny Johnson's

Motion to Suppress, also except as to some statements made. (ECF Nos. 17, 18, and 31.) The Court will also deny as moot Miffin's Motion to Suppress II.

Officer Broaddus properly searched Johnson when he searched Johnson's person, including his cross-body bag, and Officer Broaddus and his colleagues would have inevitably discovered the evidence in the car. Thus, the Court cannot suppress it. Further, the Court will not suppress statements made by Johnson before he was handcuffed or after he was mirandized, but it will suppress statements that he made while in handcuffs but before receiving his *Miranda* warnings.

Moreover, because the officers would have inevitably searched the car, and because they could lawfully search Miffin's cross-body bag pursuant to a search of his person incident to arrest, the Court will not suppress evidence discovered during those searches.

⸱ Finally, pursuant to Miffin's Motion to Adopt and the Court's findings regarding Johnson's statements, the Court will not suppress statements made by Miffin before he was handcuffed or after he was mirandized. However, the Court will suppress statements made after he was handcuffed, but before he was mirandized.

## A.    The Court Will Grant the Motion to Adopt

Finding the motion unopposed, (*cf.* ECF No. 34), and pursuant to Local Criminal Rule 12(B), the Court will grant Miffin's Motion to Adopt. Under Local Rule 12(B), "[a] defendant may adopt a motion filed by another defendant only by filing a separate pleading for each motion that the defendant wishes to adopt." E.D. Va. Loc. Crim. R. 12(B). Miffin's Motion to Adopt complies with this local rule, as it seeks to adopt a single separate motion filed by another defendant, Johnson. "Accordingly, for simplicity and in the interests of judicial efficiency, the

15

[C]ourt deems [Johnson's Motion to Suppress] as if brought by" both Johnson and Miffin. *Dorsey v. Wallace*, 134 F. Supp. 2d 1364, 1366 n.1 (N.D. Ga. 2000).

## B.     The Court Will Deny in Part and Grant in Part Johnson's Motion to Suppress

The Court will deny in part and grant in part Johnson's Motion to Suppress. Officer Broaddus did not unconstitutionally search Johnson's cross-body bag, discovering evidence inside. Additionally, Officer Broaddus and his colleagues would have inevitably discovered the evidence in the car. Thus, the Court will deny the Motion to Suppress as to that evidence and the evidence discovered inside of Johnson's bag. The Court will also deny the Motion to Suppress as to statements Johnson made before being handcuffed and statements he made after being mirandized. Conversely, the Court will grant the Motion to Suppress as to statements Johnson made after being handcuffed but before being mirandized.

### 1.     The Traffic Stop Was Legitimate at Its Inception Because Officer Broaddus Observed a Traffic Violation

At the outset, the Court finds the stop lawful at its inception because Officer Broaddus witnessed a traffic violation, giving him probable cause to initiate the traffic stop, even accounting for newly amended Virginia Code § 46.2-1003 (the "Amended Statute" or "Amended § 46.2-1003(C)").

#### a.     Legal Framework: Initiating a Traffic Stop

The Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Brown*, 652 F. App'x 200, 201 (4th Cir. 2016) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Brief investigatory stops" include traffic stops conducted by police officers. *Id.*; *see United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) ("Temporary detention of individuals during the stop of an

automobile by the police, even if only for a brief period and for a limited purpose, constitutes a

seizure under the Fourth Amendment." (quoting *Whren v. United States*, 517 U.S. 806,

809 (1996)).

"A[ police] officer's initial 'decision to stop an automobile is reasonable[—and thus does

not violate the Fourth Amendment—]where the police have probable cause to believe that a

traffic violation has occurred.'" *Id.* (quoting *Whren*, 517 U.S. at 810). Although "[t]he concept

of probable cause is not subject to a precise definition," *United States v. Matthews*, 701 F. App'x

284, 285 (4th Cir. 2017) (Mem.) (citation omitted), the United States Court of Appeals for the

Fourth Circuit has explained that "[p]robable cause exists if, given the totality of the

circumstances, the officer 'had reasonably trustworthy information . . . sufficient to warrant a

prudent [person] in believing that the [defendant] had committed or was committing an

offense,'" *United States v. Sowards*, 690 F.3d 583, 588 (4th Cir. 2012) (first alteration in

original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964), and citing *Porterfield v. Lott*, 156 F.3d

563, 569 (4th Cir. 1998)).

> **b.      The Court Will Not Apply Changes to Virginia Code § 46.2-**
> **1003 Retroactively**

Virginia Code § 46.2-1003 provided at the time of the traffic stop that:

> It shall be unlawful for any person to use or have as equipment on a motor vehicle
> operated on a highway any device or equipment mentioned in § 46.2-1002 which
> is defective and in an unsafe condition.

Va. Code § 46.2-1003(A).

The Virginia General Assembly has since amended the statute, adding a provision that

became effective on March 1, 2021, prohibiting a "law-enforcement officer" from stopping "a

motor vehicle for a violation of this section [for defective equipment]." Va. Code § 46.2-

1003(C). The statute now also provides for the suppression of any evidence discovered during a stop for one of these nonmoving vehicle violations. *Id.*

In supplemental briefing, Johnson asserts that the change in the statute is "procedural[,] and therefore should be applied retroactively." (ECF No. 54 at 1 (citing *Commonwealth v. Woods*, No. CR20-847, 2021 WL 2818526 (Va. Cir. Ct. June 9, 2021).) In doing so, he necessarily invokes an exception to Virginia law's general presumption against retroactivity that the General Assembly has codified by statute. *See Woods*, 2021 WL 2818526, at *2 (describing the language of Virginia Code § 1-239 and its interpretation by the Virginia Supreme Court); Va. Code § 1-239. Pursuant to this exception, statutory changes that are "procedural" rather than "substantive" can apply retroactively. *See* Va. Code § 1-239; *Woods*, 2021 WL 2818526, at *2–3. Indeed, some Virginia circuit courts have found that the March 1, 2021 change to Virginia Code § 46.2-1003—and similar statutes—apply retroactively. *See Woods*, 2021 WL 2818526; *Commonwealth v. Allen*, No. CR-20-302-01, 108 Va. Cir. 193 (June 10, 2021); *Commonwealth v. Hardy*, No. CR21-338, 2021 WL 3127745 (Va. Cir. Ct. July 1, 2021).

However, these Virginia circuit court cases do not persuade this Court. This is especially so considering that different Virginia circuit courts have reached conclusions contrary to those above. *See Commonwealth v. Southerly*, No. CR21f00217-00, 2021 WL 5766748 (Va. Cir. Ct. Oct. 12, 2021) (concluding that a similar change in Virginia law *does not* apply retroactively); *Commonwealth v. Eberhardt*, Nos. 19-F-3402, 3042, 2021 Va. Cir. LEXIS 449 (Va. Cir. Ct. Sept. 16, 2021); *Commonwealth v. Cain*, No. CR20-646, 2021 Va. Cir. LEXIS 171 (Va. Cir. Ct. July 26, 2021); *Commonwealth v. Tarpley*, Nos. CR2 1000619-01, -02, -03, 2021 WL 3565508 (Va. Cir. Ct. July 7, 2021), and the Virginia Court of Appeals has yet to consider the issue.

18

To begin, "[t]he general rule[, under Virginia law, is] that statutes are prospective in the absence of an express provision by the legislature[] to the contrary." *Woods*, 2021 WL 2818526, at *1 (internal quotation marks omitted) (citation omitted); *see* Va. Code § 1-238; *Southerly*, 2021 WL 5766748, at *2 ("The legal standard on the general retroactivity of statutes enacted by our state legislature is clear and settled. Retroactivity is highly disfavored."). That is, under Virginia law, there is a presumption against retroactivity.

Moreover, the current version of Virginia Code § 46.2-1003 contains no express provision indicating that any changes that became effective on March 1, 2021, apply retroactively. *See Woods*, 2021 WL 2818526, at *1 (citation omitted); Va. Code § 1-238. This omission speaks volumes. Had the Virginia General Assembly intended to make the current version of § 46.2-1003 retroactive, it could have expressly included a provision in the statute to that effect. "A court should not second guess the legislature on matters that fall squarely within [the legislature's] enumerated powers, including, . . . public policy choices," and the Court will not do so here. *Allen*, 108 Va. Cir. 193, at *5 (citation omitted).

But the Court need not analyze whether the change to Virginia Code § 46.2-1003 is substantive or procedural because even if the change were procedural, it would nonetheless not apply retroactively. Critically, Virginia Code § 1-239—which codifies the exception as to procedural changes—limits the retroactivity of a procedural change, stating that the change "shall [apply] . . . so far as practicable." Va. Code § 1-239. To apply the change to Virginia Code § 46.2-1003 retroactively would contravene this caveat.

Rendering the Amended Statute retroactive would be unrealistic and impracticable because applying this change retroactively could open a pandora's box of confusion and delay. For instance, it would potentially enable anyone with a criminal record stemming from a traffic

stop (such as one resulting from an inoperable license plate light or a similar law) that would now violate Virginia Code § 46.2-1003 to seek redress. This likely would cause unmanageable strain on the federal and state judicial systems in Virginia. Especially given that the Virginia General Assembly declined to indicate that the change to Virginia Code § 46.2-1003 should apply retroactively, the Court will not presume retroactivity.

In sum, even considering that as of March 1, 2021, it became improper for a law enforcement officer to initiate a traffic stop for a violation of § 46.2-1003, the Court cannot apply the Amended Statute to the suppression motions stemming from this traffic stop that occurred prior to that date.

    **c.**    **Officer Broaddus Had Probable Cause to Believe a Traffic Violation Occurred Because He Observed the Car Operating <u>on a Public Road with an Unlit Light Above the License Plate</u>**

On September 1, 2020, the date of the traffic stop, Virginia law made it unlawful "for any person to use or have as equipment on a motor vehicle operated on a highway any [lighting device] which is defective and in an unsafe condition," Va. Code § 46.2-1003; *see* Va. Code § 46.2-1002.[7] Thus, upon observing the car Mr. Johnson was driving while the light above its rear license plate was unlit, Officer Broaddus had probable cause to stop the car because it was reasonable for him to believe a violation of Virginia law was occurring. *See Bowman*, 884 F.3d

---

[7] That statute provided at the time of the traffic stop, and continues to provide, in pertinent part, that:

> It shall be unlawful for any person . . . to use or have as equipment on a motor vehicle operated on a highway any lighting device . . . for which approval is required by any provision of this chapter . . . unless of a type that has been submitted to and approved by the Superintendent or meets or exceeds the standards and specifications of the Society of Automotive Engineers, the American National Standards Institute, Incorporated or the federal Department of Transportation.

Va. Code § 46.2-1002.

at 209 (quoting *Whren*, 517 U.S. at 810); *Sowards*, 690 F.3d at 588 (alteration in original) (quoting *Beck*, 379 U.S. at 91, and citing *Porterfield*, 156 F.3d at 569).

### 2. The Traffic Stop Remained Reasonable While Officer Broaddus Reviewed Defendants' Information and Investigated the Issues with the Car's Registration and License Plates

The traffic stop did not become unconstitutional while Officer Broaddus reviewed Johnson and Miffin's information or when he investigated the issues pertaining to the car's registration and license plates because these actions did not extend the stop longer than reasonably necessary for Officer Broaddus to complete his initial objectives.

### a. Legal Framework: Assessing the Constitutionality of the Length of a Traffic Stop

Probable cause to believe a traffic violation has occurred does not, by itself, enable an officer to keep an automobile and its passengers stopped indefinitely. Instead, "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for [only] as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (citations omitted).  The "traditional incidents of a routine traffic stop" include tasks such as "inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants.'" *Bowman*, 884 F.3d at 210.

"[A] legitimate traffic stop may 'become unlawful if it is prolonged beyond the time reasonably required' to complete its initial objectives." *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  "[I]n order 'to extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess reasonable suspicion [of ongoing criminal activity]

21

or receive the driver's consent.'" *Bowman*, 884 F.3d at 210 (quoting *United States v. Williams*, 808 F.3d 238, 245–46 (4th Cir. 2015)); *see Palmer*, 820 F.3d at 649–50.

Similar to that of probable cause, the concept of "reasonable suspicion" does not lend itself to a precise definition. *See Bowman*, 884 F.3d at 213 (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)). However, "to show the existence of reasonable suspicion, a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." *Id.* (internal quotation marks omitted) (quoting *Branch*, 537 F.3d at 337). This is a "commonsense, nontechnical standard . . . that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Id.* (internal quotation marks omitted) (first alteration in original) (quoting *Palmer*, 820 F.3d at 650, and *Ornelas*, 517 U.S. at 695); *see also Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021) ("That this standard requires less than probable cause does not render its burden illusory."). It is an objective inquiry, and it does not consider the officer's subjective intent. *See United States v. Powell*, 666 F.3d 180, 186 n.7 (4th Cir. 2011). Moreover, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence[] and . . . less than is necessary for probable cause." *Brown*, 652 F. App'x at 201 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).

To determine whether or not a police officer had reasonable suspicion to justify extending the duration of a traffic stop, courts consider "the totality of the circumstances." *United States v. Villavicencio*, 825 F. App'x 88, 97 (4th Cir. 2020) (citing *Arvizu*, 534 U.S. at 274). Pursuant to that analysis, "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient." *Brown*, 652 F. App'x at

22

201 (quoting *United States v. George*, 732 F.3d 296, 300 (4th Cir. 2013)).  Under this approach,

reasonable suspicion may still exist even if some factors could have innocent explanations.  *See*

*Villavicencio*, 825 F. App'x at 97 (citing *Palmer*, 820 F.3d at 650).

Ultimately, to have reasonable suspicion sufficient to extend the duration of a traffic stop,

"[a]n officer must have 'at least a minimal level of objective justification' and 'must be able to

articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity.'"

*United States v. McCauley*, 639 F. App'x 205, 206 (4th Cir. 2016) (Mem.) (quoting *Illinois v.*

*Wardlow*, 528 U.S. 119, 123–24 (2000)).  In doing so, police "officers may 'draw on their own

experience and specialized training to make inferences from and deductions about the cumulative

information available to them.'"  *Brown*, 652 F. App'x at 201 (quoting *Arvizu*, 534 U.S. at 273).

The Fourth Circuit has instructed that in analyzing the existence of reasonable suspicion, courts

may "credit[] the practical experience of officers who observe on a daily basis what transpires on

the street."  *Williams*, 808 F.3d at 253 (quoting *Branch*, 537 F.3d at 336–37).

Once a police officer has developed reasonable suspicion of ongoing criminal activity,

*see Bowman*, 884 F.3d 200 (quoting *Williams*, 808 F.3d at 245–46); *Palmer*, 820 F.3d at 649–50,

he or she may extend the investigatory stop for the period of time reasonably required to confirm

or dispel his or her suspicions, *see United States v. Green*, 740 F.3d 275, 280 (4th Cir. 2014)

(citing *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011), *as amended* (Aug. 2,

2011)*, abrogated on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015), and

*Caballes*, 543 U.S. at 407).

### b.   Officer Broaddus Did Not Improperly Prolong the Traffic Stop

After pulling Johnson and Miffin over, Officer Broaddus retrieved personal-identification

and vehicle-registration information from them and reviewed that information inside his police

23

cruiser. He then attempted to speak to Johnson about an issue with the car's registration and

license plates. None of those activities unreasonably prolonged the traffic stop. *See Branch*, 537

F.3d at 335; *Bowman*, 884 F.3d at 210.

Nor did Officer Broaddus unreasonably prolong the stop by attempting to privately

resolve with Johnson the car's license plate issue. Although this line of questioning did not

relate to the original basis for the traffic stop, Officer Broaddus possessed reasonable suspicion

"to extend the detention" beyond its original purpose, *Williams*, 808 F.3d at 245–46, because

during Officer Broaddus's proper review of Defendants' vehicle- and personal-identification

information, he discovered that neither Defendant owned the car. Importantly, he identified that

the car bore license plates assigned to a different vehicle. During that review, he also learned

that Johnson was completing a term of federal supervision, and that Miffin was a reported

member of the Crips. Officer Broaddus knew that the Crips had a reputation for violence. (*See*

ECF No. 47, at 55:17–58:18); *see also United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir.

1997) ("[A]n officer can couple knowledge of prior criminal involvement with more concrete

factors in reaching a reasonable suspicion of current criminal activity." (citation omitted)).

Taken together, even knowing that membership in a gang could not alone serve as a basis for a

search or seizure, those facts known to Officer Broaddus as he continued the stop supported

"more than an inchoate and unparticularized suspicion or hunch" of criminal activity. *United

States v. McCauley*, 639 F. App'x at 206 (quoting *Wardlow*, 528 U.S. at 123–24).

Indeed, Officer Broaddus credibly testified that at this point in the stop he "had some

concerns that [Defendants'] vehicle may have been stolen." (ECF No. 47, at 62:12–18.)

Although Officer Broaddus acknowledged that innocent explanations for the license plate issue

existed, the test for reasonable suspicion requires "considerably less than proof of wrongdoing by

a preponderance of the evidence." *Brown*, 652 F. App'x at 201 (quoting *Navarette*, 572 U.S. at

397). And Officer Broaddus's speculation at the evidentiary hearing that the license plate issue

may have resulted from a DMV- or COVID-related administrative problem does not undermine

his reasonable suspicion that he was "dealing with a possible stolen vehicle." (ECF No. 47, at

66:19–21); *see Villavicencio*, 825 F. App'x at 97 (citing *Palmer*, 820 F.3d at 650). Indeed, he

had seen Johnson and Miffin in an area where vehicle burglaries were a law enforcement focus

less than one hour earlier.

Because Officer Broaddus developed reasonable suspicion to investigate a possible stolen

vehicle during a routine records check, he did not unreasonably prolong the traffic stop by

attempting to speak with Johnson in private about the issue with the car's license plates. *See*

*Williams*, 808 F.3d 238, 245–46.

### 3.    Officer Broaddus Did Not Unreasonably Pat Down Johnson Prior to His Arrest Because Officer Broaddus Had Reasonable Suspicion to Believe that Johnson Was Armed and Dangerous

Because Officer Broaddus had reasonable suspicion to believe that Johnson was armed

and dangerous, he did not violate Johnson's constitutional rights by initiating a protective frisk.

#### a.    Legal Framework:  Initiating a Protective Frisk

"[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police

officers may order the driver to get out of the vehicle without violating the Fourth Amendment's

proscription of unreasonable searches and seizures." *United States v. Price*, 717 F. App'x 241,

243 (4th Cir. 2018) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111, n.6 (1977)).  Further,

"[o]fficers conducting traffic stops may frisk passengers 'upon reasonable suspicion that they

may be armed and dangerous.'"[8]  *United States v. Meyers*, 760 F. App'x 181, 185 (4th Cir. 2019) (quoting *Arizona v. Johnson*, 555 U.S. 323, 332 (2009)).

 The Fourth Circuit has recognized that police officers may consider "a host of factors" in developing reasonable suspicion that an individual is armed and dangerous, *United States v. George*, 732 F.3d at 299, including:  the crime rate in the area of the investigatory stop, *id.* (citing *Wardlow*, 529 U.S. at 124); the individual's "nervous or evasive behavior," *id.*; the individual's prior involvement in criminal activity, *see Powell*, 666 F.3d at 188 (citing *United States v. Holmes*, 376 F.3d 270, 278 (4th Cir. 2004)); *Holmes*, 376 F.3d at 277; the lateness of the hour when the investigatory stop occurred, *George*, 732 F.3d at 300 (citing *United States v. Foster*, 634 F.3d 243, 247 (4th Cir. 2011)); the individual's "suspicious movements," *id.* at 299–300 (citing *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998); the presence of illegal drugs, *see United States v. McCoy*, 773 F. App'x 164, 165 (4th Cir. 2019) (Mem.) (quoting *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998)) (stating that there is an "indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer"); and, the individual's membership in a gang, *see Holmes*, 376 F.3d at 277.  Ultimately, "[t]he [police] officer need not be absolutely certain that the individual is armed."  *George*, 732 F.3d at 299 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  "[T]he issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger."  *Id.*  This is an objective test that considers only "the facts within the knowledge of [the officer] to determine the presence or nonexistence of reasonable

---

[8] The Supreme Court of the United States has "deliberately linked 'armed' and 'dangerous'" and indicated that the "risk of danger is created simply because the person, who was forcibly stopped, is armed."  *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017).  Thus, police officers need not provide any additional showing of dangerousness if they have reasonable suspicion that an individual is armed.

suspicion." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) (citing *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)).

###   b.   Reasonable Suspicion Existed to Justify the Initial Pat Down of Johnson's Person

After Johnson refused to step out of the car to discuss the issue with the license plates, Officer Broaddus lawfully ordered Johnson to exit the vehicle. *See Price*, 717 F. App'x at 243 (quoting *Mimms*, 434 U.S. at 111, n.6). Once Johnson was out of the car, Officer Broaddus conducted the first pat down of his person.[9]  Consideration of "the evidence as a whole" reveals that Officer Broaddus had a reasonable suspicion that Johnson was armed and dangerous, which supported this initial pat down. *Bowman*, 884 F.3d at 213.

The United States suggests that Officer Broaddus had reasonable suspicion based on:  (1) the high-crime area where the stop occurred; (2) the early morning hour and lack of lighting during the stop; (3) the information produced from the records check; (4) the movement inside the car; (5) Johnson's disposition; and, (6) Johnson's possession of marijuana on his person and inside the car. (ECF No. 48-1, at 20.)  The Court will address each of these factors in turn.

###   i.   High-Crime Area Merits Some Weight

The Court gives only some weight to the United States's first basis for reasonable suspicion:  that the stop allegedly occurred in a high-crime area.  The United States submits that

---

[9] To the extent the parties dispute whether Johnson consented to this initial pat down, (*compare* ECF No. 51-1, at 2 n.1 *with* ECF No. 50, at 15), the Court finds that he did not. Although Johnson slightly raised his arms and turned his back to Officer Broaddus upon exiting the vehicle, the intent of that gesture appears ambiguous on Officer Broaddus's BWC. (Broaddus BWC 10:17–10:19.)  But even if Johnson's gesture implied his consent to the pat down, he unequivocally withdrew it by stating, "No, I don't want you to search me." (*Id.* 10:20–10:29; *accord* ECF No. 47, at 69:12–21.)  And "once consent is withdrawn or its limits exceeded, the conduct of the officials must be measured against the Fourth Amendment principles." *United States v. McFarley*, 991 F.2d 1188, 1191 (4th Cir. 1993).

Officer Broaddus initiated contact with Defendants during his patrol of the 65 service area, a patrol focusing on vehicle burglaries and vandalism. While those are not violent crimes, the United States contends that "someone carrying burglarious tools . . . could certainly use those weapons to harm a person or officer during a traffic stop." (ECF No. 48-1, at 20–21.)

However, "simply being in an area where crime is prevalent is minimally probative in the reasonable suspicion analysis." *Wingate v. Fulford*, 987 F.3d 299, 306 (4th Cir. 2021), *as amended* (Feb. 5, 2021) (citing cases). Although Officer Broaddus first met Defendants in the 65 service area, the stop took place in a commercial area near the major intersection between Staples Mill Road and Parham Road, one and a half miles away from the Henrico Police Department. To be sure, Officer Broaddus testified to occurrences of drug trafficking along this stretch of Staples Mill Road; however, he never testified to crimes of violence happening there.

The fact the stop occurred in a high-crime area is therefore "insufficiently particular" as to these Defendants. *Id.* An officer could not reasonably infer that either Johnson or Miffin was armed and dangerous based on their presence in the 65 service area, a known area for vandalism but not violent crime, or the intersection of Staples Mill Road and Parham Road, an arguable drug thoroughfare but an area that no party contends bears a nexus to violent crime. But knowing the car had earlier been in an area where vehicle burglaries were a law enforcement focus and finding that the license plates did not correspond to the car driven by Johnson, a reasonable person would develop suspicion that criminal activity was afoot. Accordingly, the Court accords some weight to this proffered basis for Officer Broaddus's reasonable suspicion that Johnson was armed and dangerous. *See id.*

28

## ii.   Time of Stop Merits Some Weight

The Court also assigns some weight to the second basis for reasonable suspicion, that the

stop occurred at 1:25 a.m. in a dark location.  The United States argues that traffic stops become

more dangerous "when it is late at night and dark 'due to . . . decreased [police] resources.'"

(ECF No. 48-1, at 22 (quoting ECF No. 47, at 183:9–21).)

However, as a general rule, that a traffic stop occurred at night, without more, "does little

to suggest criminal activity." *Wingate*, 987 F.3d at 306 (discussing traffic stop that occurred at

1:39 a.m.)  Nevertheless, an early-morning stop could "alert a reasonable officer to the

possibility of danger," entitling this factor to some weight under the totality of the circumstances.

*George*, 732 F.3d at 300; (*see* ECF No. 47, at 183:18–19 (officer testimony stating that "when

it's late at night and dark," there is an "the increased danger of traffic stops").  As for the dark

location of the stop, this is a "mere prox[y] for the fact that it was, indeed, late at night," and this

fact has no independent relevance under the totality of the circumstances. *Wingate*, 987 F.3d

at 306.

## iii.   Information from the Records Check Merits Substantial Weight

The third factor, the information received from the records check, strongly supports

Officer Broaddus's reasonable suspicion that Johnson could be armed and dangerous.  Before

Officer Broaddus first frisked Johnson, he knew that Johnson was on federal supervision and that

Miffin was a reported member of the Crips.  Further, Officer Broaddus reasonably suspected he

"was dealing with a possible stolen vehicle" considering that the records check associated the

license plates on Defendants' car with another vehicle.  (ECF No. 47, at 66:19–21.)

Johnson submits two arguments for according little weight to this proffered basis for

reasonable suspicion, but neither argument persuades.

29

First, Johnson contends that Officer Broaddus did not know the nature of the offense underlying Johnson's federal supervision, implying that it was unreasonable to infer a dangerous or violent criminal history. (ECF No. 50, at 13.) But an officer can couple knowledge of a suspect's criminal history "with more concrete factors" to create a reasonable suspicion of dangerousness. *Sprinkle*, 106 F.3d at 617.

Second, Johnson argues that an officer cannot rely on knowledge of a *passenger's* gang membership to infer that the *driver* was armed and dangerous. (ECF No. 50, at 14.) But, under the totality of the circumstances, knowledge "that one of the two occupants" of a car was "a member of a gang whose members had carried out numerous violent felonies while armed" can support a reasonable suspicion of dangerousness as to the other occupant. *Holmes*, 376 F.3d at 277. Here, Officer Broaddus testified that before he frisked Johnson, he knew Miffin was reported a member of the Crips, a gang that Officer Broaddus knew had a reputation for violence. (*See* ECF No. 47, at 55–57, 175.) As a result, the information Officer Broaddus received from the records check about Miffin's gang membership supplied a strong basis for reasonably suspecting that Johnson was armed and dangerous. *See id.*

### iv.    Movement in the Car Merits Substantial Weight

The fourth basis for reasonable suspicion, the movement inside the car, is entitled to substantial weight. Sergeant English observed this movement within the car, and he shared those observations with Officer Broaddus before the frisk. To be sure, Sergeant English did not elaborate on the nature of the movement to Officer Broaddus other than generically stating, "There's a lot of movement going around." (Broaddus BWC 5:35–5:40; *see* ECF No. 50, at 11.) But Sergeant English's reaction to the movement he observed—abruptly interrupting Officer Broaddus and promptly approaching the vehicle to get a better view—would reasonably alert an

officer in Officer Broaddus's position that the movement was suspicious. Indeed, Officer Broaddus himself credibly interpreted Sergeant English's behavior as "unusual and suspicious," possibly signaling "an officer safety issue." (ECF No. 47, at 60:25–61:13.) Suspicious movements such as these are particularly important, as they "can . . . be taken to suggest that the suspect may have a weapon." *George*, 732 F.3d at 299 (citation omitted); *see also id.* at 301 (describing suspicious movements as the "most important[]" factor at issue in that case).

To the extent Johnson argues that his innocent explanation for the movement that he was "putting on his slides" dissipated the movement's suspicious nature, (ECF No. 50, at 11), that argument does not persuade. Sergeant English did not relate Johnson's explanation to Officer Broaddus before Officer Broaddus conducted the initial pat down of Johnson, meaning a reasonable officer in Officer Broaddus's position could not have known this information at the time of the frisk. *See Foreman*, 369 F.3d at 781 (citation omitted) ("Because reasonable suspicion is an objective test, we examine the facts *within the knowledge* of [the officer] to determine the presence or nonexistence of reasonable suspicion." (emphasis added)). Even if Officer Broaddus knew of Johnson's innocent explanation, he need not accept it as true. A reasonable officer could interpret Johnson's unprompted explanation in the same way Sergeant English did: as "confirmation . . . that there was [furtive] reaching going on outside of [his] view." (ECF No. 47, at 187:15–17.)

### v.   Johnson's Disposition Merits Some Weight

The United States rests Officer Broaddus's reasonable suspicion, in part, on Johnson's unusual display of nervousness and agitation. (ECF No. 51-1, at 3; ECF No. 48-1, at 25.) Courts generally discount nervousness as a basis for reasonable suspicion because "[i]t is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." *Bowman*, 884 F.3d at 214

(quoting *United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011)).  But "nervousness beyond the norm" can help generate reasonable suspicion, and Johnson's nervousness and evasive behavior was indeed beyond the norm.  *Id.* at 215.

When Officer Broaddus asked Johnson to exit the car so that the two of them could speak privately about the issue with the license plates, Johnson initially declined to comply with that request.  (ECF No. 47, at 62:12–18, 62:24–25, 63:1; Broaddus BWC 8:35–8:45, 9:00–9:05, 9:25–30; *accord* ECF No. 47, at 63:22–24, 65:1–4); *see Price*, 717 F. App'x at 243 ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." (quoting *Mimms*, 434 U.S. at 111, n.6) (alteration in original)).  Then, after Johnson began complying with the request and exiting the car, Officer Broaddus asked him if he had any weapons on him.  (Broaddus BWC 9:55–10:00.)  Again, Johnson initially resisted answering the question.  (Broaddus BWC 10:10–10:12.)  Instead, he asked why Officer Broaddus was asking about weapons.  (Broaddus BWC 10:10–10:12.)  This evasive behavior, at the very least, did not allay Officer Broaddus's suspicion that Johnson was armed and dangerous.  Even though Johnson eventually indicated that he did not possess any weapons, Officer Broaddus was still justified in crediting, to a small degree, Johnson's demeanor as supporting a reasonable suspicion that Johnson did indeed have weapons on his person.  (Broaddus BWC 10:14–10:16.)

The Court recognizes "the complex reality of citizen-police relationships in many cities," *Bowman*, 884 F.3d at 215 (quoting *Massenburg*, 654 F.3d at 489).  Indeed, at the time of the stop, Richmond, Virginia, had been embroiled in protests over George Floyd's murder for months.  (*See* ECF No. 47, at 209:12–211:8.)  To be clear, Johnson's hesitations veered toward

invoking rights he thought he might have rather than toward full defiance. These circumstances mitigate the weight it gives to this fifth basis for reasonable suspicion. Accordingly, Johnson's demeanor during the stop merits only some weight in support of Officer Broaddus's reasonable suspicion that Johnson was armed and dangerous.

### vi.  Johnson's Possession of Marijuana Merits No Weight

The sixth and final proffered basis for reasonable suspicion, Johnson's possession of marijuana on his person and in the car, deserves no weight to the extent the United States attempts to use this as a basis to conduct the initial frisk of Johnson. Nothing in the record suggests that Officer Broaddus knew of Johnson's possession of marijuana before Officer Broaddus initially patted Johnson down. Because this information was not "within the knowledge" of Officer Broaddus at the time of the initial frisk, it cannot provide a basis for reasonable suspicion. *See Foreman*, 369 F.3d at 781 (4th Cir. 2004).

### vii.  The Totality of the Circumstances Gave Rise to Reasonable Suspicion that Johnson Was Armed and Dangerous

Under the totality of these circumstances, Officer Broaddus had reasonable suspicion that Johnson was armed and dangerous even though many factors merit only some weight. During a 1:25 a.m. stop, two officers observed suspicious movement by two people in a car after it was lawfully stopped. The driver was on federal supervision and the passenger was a known member of a violent gang. They were inside a car that neither owned and that bore license plates assigned to another vehicle. And, when confronted about the issue with the car's license plates, the driver seemed nervous, something that continued after an officer asked whether he had any weapons on him. These circumstances would justify an officer in Officer Broaddus's position to reasonably suspect that Johnson was armed and dangerous. *See Holmes*, 376 F.3d at 278. Accordingly, Officer Broaddus did not unreasonably prolong the traffic stop by initiating a frisk

33

of Johnson's person, *see Williams*, 808 F.3d at 245–46, nor did he otherwise violate Johnson's
Fourth Amendment rights, *see Robinson*, 846 F.3d at 696.

### 4.   Officer Broaddus Lawfully Searched Johnson

After Officer Broaddus conducted the pat down of Johnson's clothing and observed the
flake of marijuana on Johnson's shirt, he handcuffed him and conducted a more invasive search
as a search incident to arrest.  In doing so, he searched Johnson's back pockets and the zipped
cross-body bag draped across Johnson's stomach.  This search led to the discovery of the loaded
Glock 19 pistol and suspected narcotics.

### a.   Legal Framework:  Initiating a Search Incident to Arrest Before an Arrest Occurs

The Fourth Amendment places limits on when police officers may conduct a search
incident to arrest.  *Cf. United States v. Currence*, 446 F.3d 554, 557 (4th Cir. 2006) (declaring
that "[s]earches incident to arrest have a . . . temporal limitation" and later quoting *Stoner v.
California*, 376 U.S. 483, 486 (1964), and citing *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980),
to support that statement).  Specifically, "temporally, searches incident to arrest must be
'substantially contemporaneous with the arrest.'"  *Currence*, 446 F.3d at 557 (quoting *Stoner*,
376 U.S. at 486).  However, this does not mean that a police officer may only begin a search
incident to arrest after an individual has been arrested.  Instead, a police officer's "search may
begin prior to an arrest, and still be incident to that arrest," as long as the officer has "probable
cause to arrest prior to beginning [the] search."  *United States v. Patiutka*, 804 F.3d 684, 688 (4th
Cir. 2015) (citing *Rawlings*, 448 U.S. at 111; *United States v. Miller*, 925 F.2d 695, 698 (4th Cir.
1991); and *United States v. Han*, 74 F.3d 537, 541 (4th Cir. 1996)).  "[P]robable cause exists if,
given the totality of the circumstances, the officer 'had reasonably trustworthy information . . .
sufficient to warrant a prudent [person] in believing that the petitioner had committed or was

34

committing an offense,'" *Sowards*, 690 F.3d at 588 (second and third alterations in original) (quoting *Beck*, 379 U.S. at 91, and citing *Porterfield*, 156 F.3d at 569). Moreover, it is well-settled law that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his [or her] presence, he [or she] may, without violating the Fourth Amendment, arrest the offender." *United States v. Ruffin*, 814 F. App'x 741, 750 (4th Cir. 2020) (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)).

Thus, the initial inquiry is this: Before the search began, did the police officer have probable cause to believe the individual "had committed or was committing an offense," even a very minor one?

### b.   Officer Broaddus Properly Initiated a Search Incident to Arrest, as He Could Have Arrested Johnson for Violating Virginia Law

Because Officer Broad had probable cause to believe a traffic violation occurred in violation of Virginia law, *see supra* Part II.B.1.b, he had probable cause to arrest Johnson, the driver,[10] *see Ruffin*, 814 F. App'x at 750 (quoting *Atwater*, 532 U.S. at 354). This is especially true given the fact that the license plates did not match the car. Therefore, he could, and did, lawfully initiate a search incident to arrest. *See Patiutka*, 804 F.3d at 688 (citing *Rawlings*, 448 U.S. at 111; *Miller*, 925 F.2d at 698; and, *Han*, 74 F.3d at 541).

### c.   Legal Framework: Scope of a Search Incident to Arrest

Searches incident to arrest constitute a longstanding exception to the Fourth Amendment warrant requirement in that they may be more extensive than a frisk and still stay within constitutional bounds. *See United States v. Davis*, 997 F.3d 191, 195–97 (4th Cir. 2021). Specifically, during a search incident to arrest, police officers may "search both 'the arrestee's

---

[10] The Code of Virginia affirmatively recognizes that police officers may arrest individuals for traffic infractions. *See* Va. Code § 46.2-937 (2021) ("For purposes of arrest, traffic infractions shall be treated as misdemeanors.").

person and the area within his [or her] immediate control.'" *Davis*, 997 F.3d at 195 (quoting *Davis v. United States*, 564 U.S. 229, 232 (2011)). "In articulating the limits of [a search incident to arrest], the Supreme Court [has] emphasized that it is 'reasonable' for arresting officers to search the person being arrested and the area within . . . reach (1) 'in order to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape[,]' and (2) 'in order to prevent [the] concealment or destruction' of evidence." *Davis*, 997 F.3d at 195 (internal quotation marks omitted) (final alteration in original) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

As to searches of the person, "police may conduct a full search of an arrestee's person and personal items in his possession and control, without any additional justification." *United States v. Alston*, 494 F. App'x 408, 411 (4th Cir. 2012) (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973)). This includes the arrestee's pockets and clothing. *United States v. Avagyan*, 164 F. Supp. 3d 864, 890 (E.D. Va. 2016) (citing *Robinson*, 414 U.S. 218).

Officers may also search "containers," or "object[s] capable of holding another object," *see Currence*, 446 F.3d at 558 (quoting *New York v. Belton*, 453 U.S. 454, 470 n.4 (1981)), incident to arrest. However, the Supreme Court and Fourth Circuit have placed significant limitations on searches incident to arrest of containers. Notably, in *Arizona v. Gant*, the Supreme Court held that that "police can 'search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search.'" *Davis*, 997 F.3d at 196 (quoting *Arizona v. Gant*, 556 U.S. 336, 343 (2009)).

In *United States v. Davis*, the Fourth Circuit recently declared that this holding applies to searches of non-vehicular containers. 997 F.3d at 197. Specifically, the *Davis* court "conclude[d] that police officers can conduct warrantless searches of non-vehicular containers

incident to a lawful arrest 'only when the arrestee is unsecured and within reaching distance of the [container] at the time of the search.'" *Id.* (quoting *Gant*, 556 U.S. at 343). The Fourth Circuit added that a warrantless search of a non-vehicular container is "permissible as a search incident to arrest [only when] it [is] reasonable for" a police officer to believe that the individual being searched "could have accessed [the container] at the time of the search."[11] *Davis*, 997 F.3d at 198 (quoting *Gant*, 556 U.S. at 343).

### d.    Officer Broaddus Lawfully Searched Johnson's Pockets

Officer Broaddus conducted a reasonable search incident to arrest of Johnson's pockets. "When officers have probable cause to arrest, they may conduct a full-body search, including pockets and clothing." *Avagyan*, 164 F. Supp. 3d at 890 (citing *Robinson*, 414 U.S. 218); *see Alston*, 494 F. App'x at 411). Accordingly, Officer Broaddus did not violate Johnson's Fourth Amendment rights by searching this part of Johnson's person, and the Court will not suppress the evidence recovered from Johnson's pockets.

### e.    Officer Broaddus Did Not Unconstitutionally Search Johnson's Zipped Cross-Body Bag During a Search Incident to Arrest

On these particular facts, the Court must also find that Officer Broaddus properly searched the bag strapped to Johnson's stomach. Although Johnson was in handcuffs at the time of the search with his hands behind his back, and the bag was resting across his stomach, Officer Broaddus did not exceed the permissible scope of a search incident to arrest. He opened the bag and searched it as, under these facts, a search incident to arrest of Johnson's person.

---

[11] It remains unclear "whether the *Gant* inquiry (1) amounts to a two-factor test . . . (secureness and reaching distance), or (2) is more akin to a sliding scale with two dimensions for evaluating the reasonableness of the officer's belief that" that the individual being searched "could have accessed [the container] at the time of the search." *Davis*, 997 F.3d at 198 n.6.

First, Officer Broaddus conducted the search incident to arrest of the bag for officer

safety reasons. He credibly testified that, just before he searched Johnson's bag, he had

"want[ed] Johnson to exit the [car (to discuss the issue with the plates)]," but that after Johnson

had exited the car, he "was still very concerned that [Johnson] was possibly armed and

dangerous based on the furtive movements, [and then Johnson's] actions, and also" based on the

fact that Johnson had called someone else to the scene, who Officer Broaddus thought might

elevate tensions upon arrival. (ECF No. 47, at 64:12–13, 75:4–76:5.) Officer Broaddus thus

decided to search Johnson's bag to "see if he had weapons on him" or more marijuana. (ECF

No. 47, at 75:22–76:8.) Whether Johnson would have to be transported post-arrest, or released,

the items in the bag would present a safety concern.

To begin, *Davis*'s holding about *containers* is inapplicable here. This case is

distinguishable.[12] In *Davis*, the defendant was separated from the improperly searched bag at the

time of the search: he had dropped the bag on the ground next to him and, at the time of the

search, he "was face down on the ground and handcuffed with his hands behind his back." *See*

---

[12] The facts of this case also differ from those of *United States v. Ferebee*, 957 F.3d 406
(4th Cir. 2020), and *United States v. Smith*, 994 F. Supp. 2d 758 (E.D. Va. 2013). In *Ferebee*,
the defendant was standing outside of a house when his backpack—located inside—was
searched, but he was unsecured and could have accessed the backpack inside within seconds.
*See Ferebee*, 957 F.3d at 419; *see also id.* (affirming the district court's finding that the
defendant had abandoned the bag, noting that he "had made a 'clear, unequivocal statement'"
disavowing ownership of the backpack and that he abandoned the backpack at that point"
(citation omitted)).

Likewise, in *Smith*, the bag was several feet away from the defendant at the time of the
search, and the defendant had consented to a search of his bag before attempting to flee. *See
Smith*, 994 F. Supp. 2d 760. The officers searched the bag after concluding that despite the
defendant's momentary flight attempt, they still had his consent to search. Moreover, it is
unclear that the reasoning in *Smith* is entirely consistent with the later-decided *Davis*. *Smith*
seems to suggest that police officers may, in some circumstances, search an individual's bag
pursuant to a *Terry* stop without first patting down the bag. *See id.* 763–68. Officers should not
be more limited during a search incident to arrest under *Davis*, than during a *Terry* stop
under *Smith*.

38

*Davis*, 997 F.3d at 198. The bag was not physically touching his person, unlike the facts here. Johnson's bag was draped across his stomach at the time of the search. The *Davis* defendant was physically separated from the searched bag. *See id.*

This is a key distinction, as the officers in *Davis* could have moved the defendant himself and left the bag alone. The same cannot be said here, where the cross-body bag rested across Johnson's body. Johnson himself could not move without the bag moving with him, and it could not be removed without the handcuffs being taken off. Even if Officer Broaddus cut the strap, the bag likely would have to remain in police custody or be searched for safety reasons once removed. For instance, it could have contained a gun or other weapon that capable of discharging or otherwise harming an officer if mishandled. This Court must find that, even if the bag were removed, a reasonable officer would have believed that it presented a threat to police officer safety. Thus, the search of the cross-body bag more closely mirrors a search of clothing, such as a sweatshirt with a pocket across the stomach or pants pockets. *See United States v. Kithcart*, 34 F. App'x 872, 873 (3d Cir. 2002) (characterizing a fanny pack as "outer clothing" that can be searched). In *United States v. Knapp*, the United States Court of Appeals for the Tenth Circuit emphasized that a key factor in determining whether a defendant's personal effects constitute their "person" is the ability "to separate the arrestee from [the item]." 917 F.3d 1161, 1166 (10th Cir. 2019) (concluding that a handheld purse was not part of the defendant's "person").

Perhaps *the* paramount consideration authorizing searches incident to arrests is the need to ensure that the arrestee maintains no access to a concealed weapon. When an arrestee clasps a purse, as was the case in *Knapp*, an officer may ensure their safety by simply removing the purse from the arrestee's possession. But as the instant case evinces, officers have no ready ability to

remove a bag draped around an arrestee's shoulder while the arrestee is handcuffed (without engaging in maneuvers that might injure the arrestee). The Court notes that ultimately, Officer Broaddus *did* remove the bag by cutting it off Johnson's chest. But the destruction of an arrestee's property can hardly be a workable solution to every search of a bag draped around one's shoulder. In any event, the bag likely would have to remain in police custody, even if cut off, further emphasizing the need to eventually search the bag for safety purposes. *Compare Stanek*, 536 F. Supp. 3d at 738 (explaining that "[c]ase authorities have tended not to focus on whether a bag that is worn by an arrestee should be treated the same way as a handheld bag" and describing several cases). Accordingly, this search must be analyzed as a search incident to arrest of Johnson's *person*, meaning *Davis* does not apply.

As a search incident to arrest of Johnson's person, Broaddus did not violate Johnson's Fourth Amendment rights when opening the bag. When searching an individual's person incident to arrest, "police may conduct a full search of an arrestee's person and personal items in his possession and control, without any additional justification." *Alston*, 494 F. App'x at 411 (citing *United States v. Robinson*, 414 U.S. at 235). Because Johnson wore the bag across his body so that it could not have been easily removed after he was handcuffed, nor could *he* be moved without it, the Court concludes that Officer Broaddus conducted a proper search incident to arrest.[13] *See id.* (citing *Robinson*, 414 U.S. at 235).

_____

[13] It might have been better protocol and in the interest of positive community relations for Officer Broaddus to alert Johnson that he was going to open the bag before doing so.

**5.      Officer Broaddus and the Other Police Officers on the Scene Would
Have Discovered the Evidence in the Car Through Inevitable
Discovery**

Even though Officer Broaddus could not, without a warrant, search the car as part of the

search of Johnson incident to his arrest, *see Davis*, 997 F.3d at 193 (citing *Gant*, 556 U.S. at

344), he and the other officers would have discovered through inevitable discovery the evidence

in the car that Johnson now seeks to suppress.  Consequently, the Court will not suppress that

evidence.

**a.      Legal Framework:  Inevitable Discovery and Inventory
Searches**

"Generally, the government is prohibited from using evidence discovered in an unlawful

search against the individual whose constitutional right was violated." *United States v. Seay*, 944

F.3d 220, 223 (4th Cir. 2019) (citing *United States v. Doyle*, 650 F.3d 460, 466 (4th Cir. 2011)).

However, the inevitable discovery doctrine serves as an exception to this rule. *Id.* (citing *United*

*States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017)).

Pursuant to the inevitable discovery doctrine, "the government [may] use evidence

gathered in an otherwise unreasonable search if it can prove by a preponderance of the evidence

that law enforcement would have ultimately or inevitably discovered the evidence by lawful

means." *Id.* (internal quotation marks omitted) (quoting *Bullette*, 854 F.3d at 265).  In that

context, "[t]he burden of showing something by a preponderance of the evidence . . . simply

requires the trier of fact to believe that the existence of a fact is more probable than its

nonexistence." *Salem v. Holder*, 647 F.3d 111, 116 (4th Cir. 2011) (internal quotation marks

omitted) (quoting *United States v. Manigan*, 592 F.3d 621, 631 (4th Cir. 2010)).  Further,

"'[l]awful means' include searches that fall into an exception to the warrant requirement, 'such

41

as an inventory search[14] that would have inevitably uncovered the evidence in question.'" *Seay*, 944 F.3d at 223 (quoting *Bullette*, 854 F.3d at 265).

"For the inventory search exception to apply, the search must have be[en] conducted according to standardized criteria[—]such as a uniform police department policy[—]and performed in good faith." *Id.* (first alteration in original) (internal quotation marks omitted) (quoting *United States v. Matthews*, 591 F.3d 230, 235 (4th Cir. 2009)). "The government may demonstrate standardized criteria 'by reference to either written rules and regulations *or* testimony regarding standard practices.'" *Id.* (quoting *United States v. Clarke*, 842 F.3d 288, 294 (4th Cir. 2016)).

> **b.      The Officers Would Have Inevitably Searched the Car Because It Was an Inoperable Vehicle, and They Would Have Inevitably Discovered the Evidence Located Inside**

A preponderance of the evidence shows that Officer Broaddus and his colleagues would have inevitably conducted an inventory search of the car, and therefore, even in the absence of the above-described unconstitutional search of Johnson's bag, they would have discovered the evidence found in the car that Johnson seeks to suppress. Specifically, the officers would have towed the car because of its improper license plates. Prior to towing the vehicle, they would have conducted an inventory search that would have uncovered the evidence located inside of the vehicle: the Taurus 9mm pistol, the blunt from the car's center console, the digital scale, the empty extended magazines for a handgun, the large quantity of baking soda, and the bags that appeared to contain narcotics.

---

[14] "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *United States v. Johnson*, 492 F. App'x 437, 440 (4th Cir. 2012) (quoting *Wren*, 517 U.S. at 811 n.1).

To begin, when this traffic stop occurred, the car was inoperable pursuant to Henrico

County Code and in violation of Virginia state law because the license plates were invalid, as

they were assigned to a different car. *See* Henrico County Code § 22-6 (defining the term

"inoperable motor vehicle," in pertinent part, as "any motor vehicle . . . which . . . does not

display valid license plates"); Virginia Code § 46.2-715 ("License plates assigned to a motor

vehicle . . . shall be attached to the front and the rear of the vehicle."), § 46.2-613(A) ("No

person shall . . . [o]perate, park, or permit the operation or parking of a motor vehicle . . . unless

. . . it has displayed on it the license plate or plates . . . assigned to it"). Indeed, Officer Broaddus

testified at the June 15, 2021 Hearing that he could not "allow [Johnson] to drive a vehicle

unlicensed to operate on a highway" and that "you[ are] required by law to have two operating

license plates . . . to operate a vehicle on the roadway." (ECF No. 47, at 71:12–16.)

Consideration of this testimony, along with Henrico County and Virginia state law, strongly

indicates that Officer Broaddus would not have permitted anyone to drive the car away from the

scene of the traffic stop, even in the absence of the unconstitutional search. *See Salem*, 647 F.3d

at 116 ("The burden of showing something by a preponderance of the evidence . . . simply

requires the trier of fact to believe that the existence of a fact is more probable than its

nonexistence." (internal quotation marks omitted) (citation omitted)).

Officer Broaddus also credibly testified that because he could not allow Johnson to drive

the car, he would have inevitably removed the license plates from the car and then towed it. (*See*

ECF No. 47, at 71:17–23.) He further stated that as part of the towing process, pursuant to

Henrico County Police policy, he would have conducted an inventory search of the vehicle

(which would have uncovered the evidence located in the car). (*See* ECF No. 47, at 71:24–73:2.)

Nothing on this records indicates that, had Officer Broaddus chosen to tow the car and conduct

an inventory search before searching Johnson, the inventory search would have been performed in less than good faith, *see Seay*, 944 F.3d at 223 (quoting *United States v. Matthews*, 591 F.3d 230, 235 (4th Cir. 2009)). This testimony supports a finding that the inventory search exception applies, *see id.* (quoting *Matthews*, 591 F.3d at 235, and *Clarke*, 842 F.3d at 294), and that the officers would have inevitably discovered the evidence Johnson now seeks to suppress, *see id.* (citations omitted).

Critically, based on testimony and other evidence provided at the Hearing, this Court concludes that Officer Broaddus and his colleagues would have inevitably discovered the evidence found in the car through an inventory search of that vehicle.[15] *See id.* (quoting *Bullette*, 854 F.3d at 265). Accordingly, the inevitable discovery doctrine applies, meaning that the Court need not suppress the evidence found in the car and that the United States may use that evidence in its prosecution of Johnson.

---

[15] Johnson cites in-court testimony and a Henrico County Police policy document suggesting that Officer Broaddus and his team would *not* have inevitably towed the car and thus that they would *not* have inevitably conducted an inventory search that would have led to the discovery of the evidence Johnson now seeks to suppress. (*See, e.g.*, ECF No. 47, at 151:8–153:7.) For instance, during the Hearing, Officer Broaddus acknowledged "that at the point that [he] searched Mr. Johnson's person, [he] had not established that [he was] going to tow the vehicle." (ECF No. 47, at 151:8–12.) And he also testified that he "suspect[ed] . . . the [license plates] were improper based off information [he] ran in [his] computer," but he could not "confirm" that there was a problem with the license plates. (ECF No. 47, at 152:7–19.)

But the testimony during the Hearing firmly established otherwise. Officer Broaddus's fair consideration of scenarios posed by defense counsel does not convince the Court that Johnson's car likely would not have been towed.

6.   **The Court Will Deny Johnson's Motion to Suppress as to Any Adverse or Incriminating Statements That He Made Before Being Handcuffed, But the Court Will Grant the Motion to Suppress as to Any Adverse or Incriminating Statements Johnson Made After Being Handcuffed But Before Being Mirandized**

In his Motion to Suppress, Johnson also asks this Court to suppress any adverse or incriminating statements made as a direct result of the seizure and ensuing searches at issue in the Motion. The Court will deny the Motion to Suppress as to statements Johnson made before being handcuffed. However, the Court will grant the Motion to Suppress as to statements Johnson made after being handcuffed but before he was given *Miranda* warnings.

a.   **Legal Framework:  Traffic Stops and the Fifth Amendment's Protection Against Self-Incrimination**

The Fifth Amendment assures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To protect this right against self-incrimination, the United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436 (1966), "adopted prophylactic procedural rules that must be followed during custodial interrogations." *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001). To that end, generally, "any statements a suspect makes during custodial interrogation are inadmissible in the prosecution's case in chief unless *Miranda* warnings have been given." *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995) (citations omitted).

"Generally, no *Miranda* custody exists for a person detained as a result of a traffic stop because this type of detention fails to 'sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'" *Hill v. Clarke*, No. 3:12cv174, 2014 WL 6388431, at *3 (E.D. Va. Nov. 14, 2014) (alteration in original) (quoting *Howes v. Fields*, 565 U.S. 499, 510 (2012)); *see also United States v. Sullivan*,

138 F.3d 126, 130–31 (4th Cir. 1998) ("In short, while a motorist during a routine traffic stop is detained and not free to leave, the motorist is not 'in custody' for *Miranda* purposes."); *Thornton v. United States*, Nos. 2:05cv281, 2:01cr235, 2006 WL 940322, at *8 (E.D. Va. Apr. 10, 2006) (stating that during a traffic stop, "the officer may detain the motorist and conduct investigatory activities, such as requesting the motorist's driver's license and running a computer check" and that "[i]f the officer develops a reasonable suspicion of a crime other than the traffic violation, he may further detain the motorist to question him and investigate the circumstances that gave rise to his suspicion" (quoting *Sullivan,* 138 F.3d at 131)). "Rather, '*Miranda* warnings are required only when the motorist is detained to an extent analogous to an arrest.'" *Hill*, 2014 WL 6388431, at *3 (quoting *Sullivan,* 138 F.3d at 131).

This is a difficult standard for defendants to meet, as the Fourth Circuit has given police officers significant leeway as to conduct that does *not* amount to a detention "to an extent analogous to an arrest." *Hill*, 2014 WL 6388431, at *3 (quoting *Sullivan,* 138 F.3d at 131). Specifically, the Fourth Circuit has "concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does *not* necessarily elevate a lawful [traffic] stop into a custodial arrest." *United States v. Stinson*, 468 F. App'x 285, 289 n.4 (4th Cir. 2012) (emphasis added) (quoting *Leshuk*, 65 F.3d at 1109–10).

### b.   The Court Will Not Suppress Johnson's Statements Made Before He Was Handcuffed

Officer Broaddus pulled Johnson over to conduct a routine traffic stop after he observed the car Johnson was driving in violation of Virginia law. *See* Va. Code §§ 46.2-1002, 46.2-1003; (ECF No. 47, at 29:1–3, 14–21, 34:13–18, 36:8–12, 38:3–4). This action did not trigger Johnson's Fifth Amendment protection against self-incrimination. *See Hill*, 2014 WL 6388431, at *3 (quoting *Howes v. Fields*, 565 U.S. 499, 510 (2012)); *Sullivan*, 138 F.3d at 130–31.

Nor did Officer Broaddus and his colleagues' behavior convert the stop into a custodial arrest before Johnson was handcuffed. *See Thornton*, 2006 WL 940322, at *8; *Stinson*, 468 F. App'x at 289 n.4 (citation omitted). The officers' behavior here was less severe than that which the Fourth Circuit has already determined need *not* trigger the Fifth Amendment's protection against self-incrimination. *See Stinson*, 468 F. App'x at 289 n.4 (citation omitted). Indeed, that court has specifically indicated that handcuffing a suspect does not automatically "elevate a lawful [traffic] stop into a custodial arrest." *Id.* (citation omitted). Nor does the officers' other conduct rise anything close to the level of "drawing weapons, . . . or using or threatening to use force"—conduct that *still* might not necessarily turn the traffic stop in this case into a custodial arrest. *Id.* (citation omitted). Accordingly, the Fifth Amendment's protection against self-incrimination does not apply to the statements made during the traffic stop before Johnson was handcuffed. As such, the Court will not suppress these statements.[16]

### c. The Court Will Suppress Johnson's Statements Made After Being Handcuffed

Once Johnson had been handcuffed, however, Johnson's detention essentially became an arrest. *See Hill*, 2014 WL 6388431, at *3 (quoting *Sullivan,* 138 F.3d at 131). Officer Broaddus's search of Johnson's cross-body bag was, therefore, a search incident to arrest. *Cf. United States v. Alston*, 494 F. App'x 408, 411 (4th Cir. 2012) (stating that pursuant to a search incident to arrest, "police may conduct a full search of an arrestee's person and personal items in his possession and control, without any additional justification" (citing *United States v. Robinson,* 414 U.S. 218, 235 (1973))). The Court will suppress any statements Johnson made after he was handcuffed, but before he was mirandized.

---

[16] These include, for example, Johnson's spontaneous statement that he was on "federal papers." (*See* Broaddus BWC 0:45–1:15.)

### d.    The Court Will Not Suppress Johnson's Subsequent Statements

In briefing, Johnson appears to argue that this Court should suppress incriminating statements made during the traffic stop *and* during subsequent questioning. (*See* ECF No. 31, at 8.)  The Court will not suppress statements made during subsequent questioning.  Johnson was mirandized as part of his formal arrest at 1:41 a.m., so no Fifth Amendment violation occurred after that time.  Indeed, it is unclear to the Court what later statements, if any, Johnson seeks to have suppressed.  Consequently, absent additional argument regarding specific subsequent statements that Johnson seeks to have this Court suppress, the Court will deny his Motion to Suppress as to any subsequent statements.

### C.    The Court Will Deny Miffin's Motion to Suppress I

Having denied in part and granted in part Johnson's Motion to Suppress, the Court now addresses Miffin's Motion to Suppress I, which the Court will deny.  In particular, the Court will deny the Motion to Suppress I as to the evidence discovered in the car and on Miffin's person, including inside of his cross-body bag.

### 1.    As a Passenger, Miffin May Challenge the Constitutionality of Actions Taken During the Stop

As an initial matter, the Court concludes that Miffin may challenge the constitutionality of actions taken during the September 1, 2020 traffic stop.  The United States asserts that Miffin has not met his burden of establishing standing to challenge the search of the car, (ECF No. 34, at 8 n.3), but this argument does not persuade because Miffin has cited clear authority establishing his right to contest the officers' actions during the stop, including the eventual search of his person and the car.  (ECF No. 36 at 3 (citing *Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007); *Brendlin v. California*, 551 U.S. 249, 255–58 (2007).)

A traffic stop constitutes a Fourth Amendment seizure of the passenger. *See Soriano-Jarquin*, 492 F.3d at 500 (citing *Brendlin*, 551 U.S. at 256–57). Further, the Fourth Circuit has held that a passenger in a car stopped by police may "challenge the constitutionality of the actions taken during the stop." *Id.* (citing *Brendlin*, 551 U.S. at 255–58). Accordingly, Miffin's status as a passenger enables him to contest the lawfulness of the officers' actions during the stop, *id.*, and the Court will consider Miffin's challenge to his seizure, (ECF No. 17, at 7; ECF No. 36, at 1).

### 2. The Officers Would Have Inevitably Discovered the Evidence in the Vehicle Through an Inventory Search

As previously discussed, Officer Broaddus and his colleagues would have inevitably towed the car and conducted an inventory search as part of the towing process, leading to the discovery in the vehicle of the Taurus 9mm pistol, the blunt from the car's center console, the digital scale, the empty extended magazines for a handgun, the baking soda, the large quantity of baking soda, and the bags that appeared to contain narcotics. *See supra* Part II.B.5.b. Thus, the Court will deny Miffin's Motion to Suppress I as to the evidence discovered in the vehicle.

### 3. Officer Broaddus Properly Searched Miffin's Cross-Body Bag During a Search Incident to Arrest

Officer Holmes mirandized Miffin at 1:41 a.m., after which Officer Broaddus and Sergeant English searched the car. After searching the car, Officer Broaddus searched Miffin's person, including his cross-body bag. Like the evidence found in Johnson's cross-body bag, the Court will not suppress the evidence discovered in Miffin's bag. Similar to Johnson, Miffin had the cross-body bag strapped across his person, so the search is not unconstitutional for the same reasons the search of Johnson's bag was not. *See Avagyan*, 164 F. Supp. 3d at 890 (citing *Robinson*, 414 U.S. at 235); *Alston*, 494 F. App'x at 411 (citing *Robinson,* 414 U.S. at 235);

*Kithcart*, 34 F. App'x at 873 (characterizing a fanny pack as "outer clothing" that can be searched); *see Knapp*, 917 F.3d at 1166. Accordingly, the Court will not suppress the evidence discovered in Miffin's bag.

### D.      The Court Will Deny as Moot Miffin's Motion to Suppress II

The United States has informed the Court, through briefing, that it "does not intend to offer any of the statements Defendant made following his federal arrest in evidence." (ECF No. 34, at 19.) This includes the statements at issue in Miffin's Motion to Suppress II. Therefore, the Court will deny as moot Miffin's Motion to Suppress II.

### E.      The Court Will Not Suppress Other Statements Made by Miffin During the Traffic Stop or Afterward, Except Those He Made While Handcuffed Before Being Mirandized

Like Johnson, through the Motion to Adopt, Miffin also asks this Court to suppress any adverse or incriminating statements made as a direct result of the seizure and ensuing searches at issue in this matter. For the reasons previously stated as to Johnson, the Court will not suppress statements made before Miffin was handcuffed. *See supra* Part II.B.6. To begin, the officers' behavior over the course of the traffic stop did not transform the stop into a custodial arrest that would trigger the Fifth Amendment's protection against self-incrimination until Miffin was handcuffed, *see Hill*, 2014 WL 6388431, at *3 (quoting *Howes*, 565 U.S. at 510); *Sullivan*, 138 F.3d at 130–31; *Thornton*, 2006 WL 940322, at *8 (mentioning that although a detained individual did not feel free to leave a traffic stop, that "understanding . . . did not put him in custody").

As with Johnson, however, the Court will suppress any statements Miffin made while in handcuffs before being mirandized. Once in handcuffs, Miffin's detention transformed into one analogous to an arrest, especially given that his colleague, Johnson, had already been handcuffed

at that point. *See Hill*, 2014 WL 6388431, at *3 (quoting *Sullivan,* 138 F.3d at 131).

Consequently, the Court will suppress statements made by Miffin between the time he was first handcuffed and the time he received his *Miranda* warnings.

However, the Government may utilize statements Miffin made at the scene of the stop after receiving his *Miranda* warnings. And further, it remains unclear to the Court what later statements—other than those discussed in his Motion to Suppress II—Miffin would like the Court to suppress. Without additional explanation as to subsequent statements Miffin would have this Court suppress, the Court will not suppress them.

Thus, the Court will not suppress any adverse or incriminating statements that Miffin made during the traffic stop or subsequent to it other than those addressed in Miffin's Motion to Suppress II and those he made during the traffic stop while in handcuffs but before being mirandized.

### III.  Conclusion

For the foregoing reasons, the Court denies in part and grants in part Miffin's Motion to Suppress I, denies Miffin's Motion to Suppress II as moot, and denies in part and grants in part Johnson's Motion to Suppress. The Court also grants Miffin's Motion to Adopt.

An appropriate Order shall issue.

Date: 6/30/2022
Richmond, Virginia

_____
/s/
M. Hannah Lauck
United States District Judge